## Case No. 18,217.

### The ZODIAC.

[9 Ben. 171.] [1]

District Court, S. D. New York.  June, 1877.

COLLISION — OPPOSITE COURSES — LIGHTS—REMISS LOOKOUTS—STEAMER AND SCHOONER—STEAMER'S DUTY.

1. A collision took place at night off Cape May, between the steamship Z. and the schooner W. W. The schooner was heading S. W. by S., and going about 7 knots, with a fresh breeze from S. E. The steamer was heading N. E. by N., when a red light ahead was seen, soon after changing to red and green. and then to green. The steamer then starboarded one point, changing her course to N. N. E., when the schooner changed her course and showed her red light alone. It was not till after this change that the schooner noticed the steamer. The steamer immediately put her helm hard-a-port, whistled, slowed, stopped and backed, but struck the port side of the schooner, sinking her. In extremis, the schooner ported hard. The schooner averred that the steamer had a bright light visible, but no red or green light. The testimony of the lookout and of the wheelsman of the schooner was not taken: Held, that it was a fault on the part of the schooner for her lookout not to have sooner seen the white light of the steamer.

2. There can be no doubt that the steamer's green and red lights were burning.

3. The steamer was in fault in not starboarding enough when the schooner showed her green light. Damage apportioned.

[Cited in The Beta, 40 Fed. 900.]

In admiralty.

Edward L. Owen, for libellants.

John Sherwood, for claimants.

BLATCHFORD, District Judge. The libellants, as owners of the schooner William Wallace, bring this libel against the steamship Zodiac, to recover the damages sustain-

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

ed by them in consequence of the total loss of the schooner through a collision, which took place between her and the steamer, about midnight on the 6th of October, 1872, in the Atlantic Ocean, off Cape May. The schooner was bound from Boston to Philadelphia, in ballast. The steamship was bound from North Carolina to the city of New York. She struck the schooner about amidships, on the port side of the schooner.

The libel alleges that the schooner was heading about southwest by south; that the wind was about southeast; that she had all sails set except the jib topsail; that she had her green and red lights properly set, and they were burning brightly, and were seen in due time by those navigating the steamer; that she had a competent lookout properly stationed and faithfully attending to his duties, and kept her course; that the collision was caused solely by the carelessness and improper manner in which the steamer was equipped and navigated; that she was heading in the usual course for such a voyage, which was about northeast; that she had no lookout properly stationed, attending to his duty; and that she had only a bright light at the masthead, and did not carry at the time either a red or green light. The libel gives no intelligent account of how the collision could have happened, or came to happen. It alleges that the schooner headed southwest by south, and the steamer northeast; and yet, that the steamer struck a square blow on the port side of the schooner, and the schooner kept her course. This would require that the steamer should have changed her course nine points, and have come to be heading north-west by west, at the time of the collision. The libel does not allege how the steamer came to perform so strange a manœuvre in the presence of the visible lights of the schooner, which lights it alleges were seen in due time by those navigating the steamer.

The answer alleges, that, on the steamer, a red light ahead was reported and seen, the course of the steamer being north-east by north; that soon thereafter a red and green light appeared, and immediately the red light was shut out; that thereupon the order was given to heave the wheel to starboard, which order was promptly executed, thus presenting the green light of the steamer to the green light of the schooner, which was for a considerable time plainly visible from the starboard of the steamer; that the steamer was then on a course about north north-east, when, suddenly, the schooner changed her course, shutting in her green light and again opening her red light; that immediately the wheel of the steamer was hove to port and the signal given to stop and back her, but she struck the port side of the schooner; that the steamer had a competent lookout who faithfully performed his duty, and her bright mast-head light and her green and red side lights were good, clear lights and burn-

ing brightly; that the red light of the schooner was seen at a considerable distance, and, after her first change of course, her green light was plainly in view for a considerable time, and the green light of the steamer was, during that time, plainly visible to those upon the schooner; and that the collision was wholly due to the change in the course of the schooner and to the unskilful navigation of those on board of her.

That the schooner had her green and red lights set and properly burning is clear. The only witnesses from the schooner whose testimony has been given, are two in number—Ireland, the master, and Jackson, the mate. There were three other persons on board, part of her crew—a steward and two seamen. One of the seamen was stationed forward as a lookout and another seaman was at the wheel. Those two seamen, with the master and the mate, were the only persons on deck. The steward was a negro. All reasonable effort seems to have been made by the libellants to secure the testimony of the two seamen who were on deck. It is admitted, that, before this suit was commenced, the counsel for the libellants took down in writing their statements, and that, on such statements, their testimony was of importance for the libellants. Although the absence of their testimony cannot be attributed to any fault on the part of the libellants, yet the lack of their testimony is a misfortune for the libellants and for their case. When the question in issue is as to whether a vessel sailing by compass changed her course, the testimony of the man whose hands moved her helm and whose eyes were on her compass, is very necessary, and, generally, indispensable. When the question in issue is as to whether a lookout saw as soon as he ought to have seen them, the lights of an approaching vessel, his testimony on the subject is very desirable.

On the schooner, it was the master's watch on deck. The man at the wheel and the man forward were in the master's watch. The master's watch on deck had commenced, and the mate's watch on deck had terminated, shortly before, but the mate still remained on deck. The master's story is, that he was standing by the after companion-way on the port side, which was the weather side, when the lookout forward reported that he saw some kind of a light on the port bow; that he, the master, then walked forward thirty or forty feet, and when he reached there saw a very dim white light bearing about south south-west, (his course being southwest by south, and the light thus being about a point on his port bow), and about 300 yards distant; that he saw no other lights on the vessel, and could not at that time see her hull or her sails; and that, when the vessel came nearer he saw her hull and started to go aft, and was knocked down by the collision. He also says, that the wind was about south-east, a good fresh breeze, and

the schooner was making about seven knots; that, with her sheets flat, she could sail five points from the wind; that, when his watch began, she was heading south south-west, (which was six points from the wind), and he changed her course to south-west by south, which was one point further away; that she at no time had her sails shaking in the wind; that, in the alarm and just before the vessels collided, the wheel of the schooner was put hard-a-port; and that the steamer struck the schooner just forward of the main rigging of the schooner, glancing a little aft, on the port side of the schooner.

The testimony of the mate of the schooner is to the same effect as that of the master. He says that he saw the white light of the steamer, after it was reported, about a point and a half on the port bow of the schooner, and about 300 yards off; that the light continued to preserve the same bearing; that, when the steamer was half her length, or a little more, away, the master gave the order to hard up; and that the sails of the schooner did not at any time shake in the wind.

The change of course on the part of the schooner of which the steamer complains is, that after the schooner had changed her light from red to green, and the steamer had starboarded, the schooner shut in her green light and again opened her red light. It is alleged that the green light of the schooner was in view for a considerable time from the steamer, over her starboard, after the steamer had starboarded, and that after that the schooner changed so as to show her red light. When the white light of the steamer was seen a point and a half over the port bow of the schooner, the schooner must have presented her red light to the view of the steamer. As it was then for the first time that the steamer's light was seen by the schooner, I conclude that the schooner first saw that light a considerable time after the steamer had seen the schooner's lights. The steamer's white light had been taken down and trimmed and replaced, and it was after it had been replaced that all the changes of the schooner's lights which are detailed in the answer were seen from the steamer. The steamer noticed all those changes in the schooner's lights, whereas it was not till after the last change in the schooner from green to red that the schooner noticed the steamer's white light.

What bearing does this tardy observation of the steamer's light have upon the case? It has this bearing. Till the steamer's light was observed, her presence was not known. Where there is nothing to arrest the attention, and exact care and vigilance, the attention is apt to flag and care is apt to be relaxed. The special importance of keeping his course, because there was an approaching steamer ahead, was not presented to the mind of the master of the schooner. Hence, before he saw over his port bow the white light of the steamer, at which time he was presenting his red light to the steamer, and after which time he made no change except the porting in extremis, he had no especial motive to keep his particular course strictly, or to observe by his compass whether such course was strictly kept. Undoubtedly he kept his general course; but, with such a wind, in direction and force, the schooner sailing seven points off the wind, would tend to make lee way, and the impulse and effort of the man at the wheel would constantly be to keep her from falling off before the wind. Moreover, with a compass course south-west by south, it is shown that she could lie at least one point nearer to the wind with her sails trimmed as they were, and not have them shake. So that, consistently with the testimony of the master and the mate, the schooner may very well have presented to the view of the steamer the appearances and changes of her lights, to which those on board of the steamer testify, and which will be considered hereafter. I think it was a fault on the part of the schooner for her lookout not to have sooner seen the white light of the steamer. That light had been trimmed and put in place again, and was burning well at the time the first light on the schooner was first seen by the steamer. It must have been visible at a greater distance than the colored lights on the schooner. Yet it was not observed by the lookout on the schooner until a considerable time after the steamer saw the first time the red light of the schooner, or, if he did see it, he failed to report it. He was remiss in the one respect or the other. If he had not been thus remiss, the master of the schooner would have had earlier knowledge of the approach of the steamer, and would have been careful to keep his course strictly, and not present vacillating lights to the view of the steamer. The vessels were approaching each other nearly end on, and it was of the utmost importance that the steamer, after determining, from the appearance of the schooner's lights, on which side she would pass the schooner, should be left free to carry out that determination. Such fault on the part of the schooner contributed to the collision.

The steamer had her green and red lights burning. The master and the mate of the schooner did not at any time see them, but, on the evidence, there can be no doubt they were burning. The red light of the schooner was seen nearly ahead by those on the steamer, and, almost immediately after that, such red light disappeared, and the green light of the schooner came into view. Thereupon the steamer starboarded one point and went upon a north north-east course. Sabiston, the second mate of the steamer, who was in the pilot-house with the master and the man at the wheel, and whose watch it was at the time, used his glass to look at the red light, and judged it to be two or three

miles off, and, while still using his glass, saw the green light appear, so that red and green were visible together, and then saw the red disappear, leaving the green in view. There can be no mistake about such testimony. It is distinct, and shows a change of course on the part of the schooner. Such change was notice to the steamer to starboard, and she did starboard. Sabiston says that the starboarding threw the steamer's head to port probably a little more than a point; that thereafter the green light of the schooner remained in view on the starboard bow of the steamer; and that, after the steamer had so fallen off a point or more, she was steadied on her new course. After that the schooner shut in her green light and showed her red, and the steamer immediately put her helm hard-a-port and blew her steam whistle, and slowed and stopped and backed, but the vessels collided.

Sabiston testifies, that when the wheel of the steamer was steadied after starboarding, the green light of the schooner bore a point or a little more on the starboard bow of the steamer; that she was then the best of a mile off; and that, when she showed her red light again, she was two points on the starboard bow of the steamer, and from 200 to 500 yards off. He also says, that if the schooner had not changed her course after the steamer had starboarded, the steamer would have cleared the schooner by from 300 to 400 yards. It is evident that the steamer did not give the schooner a very wide berth. She had turned to the leeward of the schooner, and, as before remarked, the schooner could not fail to make leeway. The steamer did not shake off the schooner to any safe degree. The steamer had seen the schooner change from red to green, and such a change in the broad ocean, at the place where the vessels were, and with the wind as it was and the steamer's white light burning so as to be visible to the schooner, because her colored lights were visible to the steamer, ought to have induced the steamer to believe that the schooner did not see the steamer's light (as was the fact), and to give the schooner more of a berth. With the schooner's green light in view a little on the starboard bow of the steamer, it was proper for the steamer to starboard, but she ought not to have steadied as soon as she did. She ought to have starboarded more than a point. It was her duty to avoid the schooner as much after the schooner showed her green light as before, and even to be more cautious to do so, because of the previous erratic change of the schooner from red to green. The steamer had plenty of time and opportunity to make a change of more than one point to port. I do not regard it as by any means clear, on the evidence, that the steamer would have cleared the schooner, even if the schooner had continued to show her green light.

As both vessels were in fault, there must be a decree for an apportionment of the damages which shall be shown to have been sustained by the libellants.